UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
CONOCOPHILLIPS, PHILLIPS PETROLEUM
COMPANY and TOSCO CORPORATION,

                    Plaintiffs,                    **MEMORANDUM and ORDER**

        -against-

                                              02-CV-6575 (SLT)

261 EAST MERRICK ROAD CORP., d/b/a
FREEPORT EXXON, ADELMO CIOFFI,
MADELINE CIOFFI and ADNAN KIRISCIOGLU
and GULDEN, INC.,

                    Defendants.
----------------------------------------------------------------x

**TOWNES, United States District Judge:**

       Plaintiffs, who are licensed to use the "Exxon" trademark and who refine and market

motor fuels and other petroleum products in New York under that brand, bring this diversity

action alleging, *inter alia*, that defendants breached agreements relating to the operation of a

retail gasoline service station. Plaintiffs now move pursuant to Rule 56 of the Federal Rules of

Civil Procedure for summary judgment as to all nine counts of the Amended Complaint, and

defendants move for partial summary judgment. As described below, both plaintiffs' motions

and defendants' motions are granted in part and denied in part.

**BACKGROUND**

       Except where otherwise specified, the parties agree on the following facts. On or shortly

before December 1, 1996, defendant 261 East Merrick Road Corp. (hereinafter, "261 Corp.")

entered into three separate but related agreements (collectively, the "Contract Dealer Account

Agreements" or "CDA Agreements") with Exxon Company, U.S.A. (a division of Exxon

Corporation and hereinafter "Exxon") concerning a service station 261 Corp. owned and

operated at 261 East Merrick Road in Freeport, New York (hereinafter, the "Premises"). Since

these three agreements – the CDA Supply Agreement, the CDA Identifications and Equipment Agreement, and the CDA Payment Agreement – are central to this action, this Court will briefly summarize the terms of these agreements.

<u>The CDA Supply Agreement</u>

The CDA Supply Agreement ("Supply Agreement"), which was executed by 261 Corp.'s president, defendant Adelmo Cioffi, and became effective December 1, 1996, obligates 261 Corp. to sell only Exxon-branded gasoline and petroleum products for a period of ten years (*i.e.*, until December 1, 2006). Supply Agreement at Art. 1 and § 9.1. During that period, 261 Corp. is required to buy all of its gasoline directly from Exxon, and to receive at least 101,250 gallons each month (1,215,000 gallons annually). *Id.* at § 2.1.3. Exxon, on the other hand, is required to supply up to 135,000 gallons a month (1,620,000 gallons annually). *Id.* at § 2.1.2.

The Supply Agreement provides that Exxon may terminate the contract for the reasons listed in Article 20. Termination is permitted, for example, when 261 Corp. fails to pay Exxon in a timely manner, Art. 20(K), or when 261 Corp. fails to operate the premises for seven consecutive days. Art. 20(L). There are no provisions permitting 261 Corp. to terminate the contract.

261 Corp. is also not permitted to assign its rights and obligations under the Supply Agreement, unless a valid state statute requires otherwise. *See* Rider to Supply Agreement governing Assignability. Even under those circumstances, 261 Corp. is prohibited from assigning the contract "unless the statutory requirements have been met" and 261 Corp. has notified Exxon in writing and supplied certain specified information. *Id.*

These termination and assignment provisions are, to some degree, echoed in a separate "Key Person Clause," which was executed by Adelmo Cioffi along with the Supply Agreement

and which, by its terms, is "incorporated into and made a part" of that agreement.  Key Person

Agreement at ¶ 1.  In this document, Adelmo Cioffi represents that he, Madeline Cioffi, and

Margaret Manzo are the sole shareholders of 261 Corp., and agrees to notify Exxon immediately

in writing if their stock is "leased, mortgaged, pledged, assigned, sold, or transferred in any way

. . . ."  *Id.* at ¶ 2.  Adelmo further agrees that he, as the "Key Person" under the Supply

Agreement, will "personally operate on a daily basis the motor fuel store business," and that, if

he does not do so, Madeline will.  *Id.* at ¶ 3(a) and (b).  The Key Person Clause also provides

that if either section 2 or 3 is violated, Exxon may terminate the Supply Agreement.  *Id.* at ¶ 3(c).

The CDA Identifications and Equipment Agreement

Under the CDA Identifications and Equipment Agreement ("Equipment Agreement"),

Exxon agrees to loan 261 Corp. certain items for use at the Premises.  Although the parties tend

to group these items together, the Equipment Agreement divides the loaned items into two

categories: "Identifications," which are defined as "signs displaying any trade name, trademark,

brand name, label, insignia, symbol, identification, or imprint owned by Exxon or used by Exxon

in its business," and "Equipment," a residual category encompassing all loaned items which are

not "Identifications."  Equipment Agreement at §§ 2.2 - 2.3.1.  The items loaned are listed in an

attachment to the agreement, labeled Exhibit A.  Although some of the items listed in Exhibit A

appear to be "Identifications" (*e.g.*, four "End Signs," one "ID Major Sign," and two "Canopy ID

Signs"), all of the items are listed under the heading, "Equipment."

The Equipment Agreement further provides that any "additional or replacement" items

loaned to 261 Corp. "will be listed on a new Exhibit A" to be furnished by Exxon and that this

new exhibit will "replace the existing Exhibit A."  *Id.* at § 2.1.  Although the parties disagree

over plaintiffs' claim that additional items worth $79,580.73 (the "Additional Equipment") were

installed at the Premises on September 14, 2001, and April 30, 2002, the parties agree that plaintiffs never furnished defendants with a new Exhibit A.  Defendants' Rule 56.1(a) Statement ("Def. 56.1 Statemt") at ¶ 28; Plaintiffs' Counter-Statement Pursuant to Rule 56.1(b) ("Pl. 56.1 Counter-Statemt") at ¶ 28.

Under the terms of the Equipment Agreement, Exxon agrees to install the loaned items, *id.* at § 2.1, and 261 Corp. agrees to pay $250 per month to use them.  *Id.* at § 4.1.  The agreement expressly provides that title to the items is to remain with Exxon.  *Id.* at § 8.1.  However, the agreement also provides that title to the "Equipment" (not the "Identifications") can pass "[u]pon the expiration or termination" of the Equipment Agreement under certain circumstances.  *Id.* at Art. 9.  Specifically, Article 9 of the contract provides that, upon expiration or termination of the Equipment Agreement, Exxon has the right to enter the Premises within 60 days "to either remove or abandon in place" any or all of the "Equipment."  *Id.* at § 9.1.1.  Section 9.1.4 of the Equipment Agreement provides that title to any "Equipment" not removed by Exxon within 90 days of the expiration or termination of the contract will "automatically pass" to 261 Corp.

Like the Supply Agreement, the Equipment Agreement is a ten-year contract, with an expiration date of December 1, 2006.  *Id.* at § 1.1.  However, the Equipment Agreement gives Exxon the right to cancel it "upon expiration, termination, nonrenewal or cancellation of the . . . Supply Agreement . . . or at any time upon ninety (90) days' prior written notice."  *Id.* at Art. 3.  The Equipment Agreement does not contain a provision permitting 261 Corp. to terminate the contract.  Rather, it contains a provision requiring 261 Corp. to "reimburse Exxon on demand . . . for the cost of installation and removal" of "Identifications" and "Equipment" if, *inter alia*, 261 Corp. "stops doing business" at the Premises or "does not comply with any of [261 Corp's]

agreements with Exxon." *Id.* at § 12.3.1. The amount of that reimbursement is prescribed by

Section 12.3.2, which reads:

> Exxon and [261 Corp.] agree that the proper reimbursement will be
> the cost of installation and removal, less Ten percent (10%) for
> each year that this [Equipment Agreement] has been in effect.

In addition, the Equipment Agreement requires 261 Corp. to reimburse Exxon "on demand for

all costs, fees (including attorneys' and experts' fees), and expenses incurred by Exxon in

enforcing its rights or remedies" under the contract. *Id.* at Art. 19.

The Equipment Agreement expressly prohibits 261 Corp. from transferring or assigning

its rights under the contract. *Id.* at § 15.1. This section of the agreement specifically states that

Exxon's "acceptance of any payment made by any person or entity other than [261 Corp.] does

not represent Exxon's consent to [261 Corp.'s] attempt to transfer or assign . . . ." *Id.* In

addition, the Equipment Agreement contains an "integration" (or "merger") clause which states,

in boldface type, "[t]here are no binding oral representations, stipulations, warranties, or

"understandings" relating to this . . . Agreement that are not fully set out in this . . . Agreement."

*Id.* at § 23.1.2.

The CDA Payment Agreement

In the CDA Payment Agreement ("Payment Agreement"), 261 Corp. agrees to "operate

an Exxon branded retail [Motor Fuel Facility]" on the Premises in accordance with the Supply

Agreement. Payment Agreement at ¶ 1. Exxon agrees to pay 261 Corp. $7,500 per month,

provided, *inter alia*, that 261 Corp. remains in total compliance with all of the CDA Agreements.

*Id.* at ¶ 3. The Payment Agreement provides an "estimate" of the cost of the items loaned to 261

Corp. under the Equipment Agreement, stating, "Exxon and [261 Corp.] estimate that . . . the

cost of the Identifications and Equipment will be approximately $109,100 . . . ." *Id.* at ¶ 5A.

The Payment Agreement also contains a paragraph relating to defaults. In the printed contract, this section reads, in pertinent part:

> If [261 Corp.] . . . fails to meet, comply with, or breaches any of its obligations under this Agreement, the Supply Agreement, the Equipment Agreement, or any other agreement between Exxon and [261 Corp.] . . . in addition to all other rights and remedies available to Exxon under such documents, at law and equity, Exxon may terminate this Agreement with no further obligation to make CDA Payments. *   *   *   If the Supply Agreement is terminated due to a breach or default under this Agreement, the Supply Agreement, the Equipment Agreement or any other agreements between Exxon and [261 Corp.],[261 Corp.] will pay to Exxon as liquidated damages sustained by Exxon due to such breach or default 2.0 cents per gallon for each gallon of gasoline that [261 Corp.] . . . was obligated to purchase during the remaining term of the Supply Agreement, but has not purchased at the time the Supply Agreement is terminated.

*Id.* at ¶ 9.

The parties agree that at the time the Payment Agreement was executed, this paragraph was amended by manually crossing out the figure "2.0," and substituting the figure "1.6," thereby reducing the amount of liquidated damages by 0.4 cents per gallon. Def. 56.1(a) Statemt at ¶ 11; Pl. 56.1 Counter-Statemt at ¶ 11. However, the parties disagree as to whether this paragraph was subsequently modified to further reduce this figure. *Id.* Defendants contend that on January 22, 1997, Exxon's New York Area Manager, Richard A. DeBree, agreed to revise the liquidated damages clause, and did so by crossing out "1.6" and writing "1/22/97 Revised 0.7" in the margin of page 6 of the Payment Agreement. Affidavit of Adelmo Cioffi, dated Feb. 10, 2005 ("Cioffi Aff.") at ¶ 19. Plaintiffs deny that such further amendment took place, Pl. 56.1 Counter-Statemt at ¶ 11, and have introduced evidence that their copy of the contract contains no such modifications. Affidavit of Margaret Pulcini-Gillece, dated Mar. 4, 2005 ("Pulcini-Gillece Aff.") at Ex. 1.

At about the same time the parties entered into the Payment Agreement, the parties executed a side agreement (hereinafter, the "Hours rebate credit agreement"), in which Exxon agrees to give 261 Corp. a rent rebate if 261 Corp. keeps the Premises open 24 hours a day, seven days a week.  *See* Opposition Affidavit of Adnan Kiriscioglu, dated April 15, 2005 ("Kiriscioglu Opp. Aff.") at Ex. F.  Although the amount of the rebate depends on the amount of gasoline sold at the Premises each month, the agreement states that the credit will appear "on the monthly *rent* invoice."  *Id.* (emphasis added).  The Hours rebate credit agreement specifically provides that "[t]he Hours Rebate credit will reduce the total amount due Exxon on that invoice." *Id.*

Post-Contract History

For almost six years after the CDA Agreements became effective, gasoline sales at the Premises far exceeded the amounts required under the Supply Agreement.  The parties agree that between December 1, 1996, and October 15, 2002, the station received, and presumably sold, an average of about 2 million gallons of gasoline per year.  *See*, *e.g.*, Plaintiffs' Rule 56.1 Statement ("Pl. 56.1 Statemt") at ¶ 4; Defendants' Counter-Statement Pursuant to Rule 56.1(b) ("Def. 56.1 Counter-Statemt") at ¶ 4.[1]

_____

[1]Plaintiffs represent that, during this period, plaintiff Tosco Corporation ("Tosco") acquired Exxon's retail marketing assets in New York and elsewhere, including the CDA Agreements with 261 Corp.  Pl. 56.1 Statemt at ¶¶ 16-17.  Plaintiffs further assert that Tosco was subsequently acquired by plaintiff Phillips Petroleum Company, which then merged with Conoco to form plaintiff ConocoPhillips.  *Id.* at ¶ 18.  These transactions are documented in the attachments to the Declaration of W. Thomas Skok, submitted as part of plaintiffs' motion for summary judgment.

In their Counter-Statement Pursuant to Rule 56.1(b), defendants neither admit nor deny these allegations, but merely argue that the documentation of these transactions should be precluded as a sanction for plaintiffs' alleged failure to produce these documents until four months after the discovery deadline had passed.  Def. 56.1 Counter-Statemt at ¶¶ 16-18.

About 45 days into the sixth year of the contract, however, 261 Corp. leased the Premises to defendant Gulden, Inc. ("Gulden") for a term of twenty years.  Lease Agreement at ¶ 2.  This lease, executed on January 15, 2002, by 261 Corp.'s president, Adelmo Cioffi, and Gulden's president, defendant Adnan Kiriscioglu, obligates 261 Corp. to, among other things, "cause the Dealer Supply Agreement with Exxon-Mobil to be canceled" upon written request of Gulden. *Id.* at ¶ 8(d).  Although the lease does not purport to assign 261 Corp.'s rights and obligations under the CDA Agreements, Gulden began to operate the Premises in mid-January 2002.  Pl. 56.1 Statemt at ¶ 19; Def. 56.1 Counter-Statemt at ¶ 19.

The parties disagree as to when plaintiffs' first became aware that Gulden was operating the Premises.  In their 56.1 Counter-Statement, defendants assert that plaintiff knew Gulden was operating the station as early as January 17, 2002, when Kiriscioglu sent plaintiffs an Electronic Funds Transfer Authorization form which expressly stated that Gulden was operating the Premises.  *See* Affidavit of Adnan Kiriscioglu, dated March 3, 2005 ("Kiriscioglu Aff.") at ¶ 8 and Ex. B.  Plaintiffs claim that this transfer of the operation was "[u]nbeknownst to ConocoPhillips."  Pl. 56.1 Statemt at ¶ 19.  However, neither party alleges that 261 Corp. ever provided plaintiffs with a written notice of its intent to assign its interests under the contract or that Gulden specifically agreed to comply with the requirements of the CDA Agreements.

On October 16, 2002, Gulden stopped operating the Premises as an Exxon-branded station.  Gulden replaced the Exxon signs and logos with "US Gas" brand signs and logos, and began selling non-Exxon branded gasoline, purchased from suppliers other than plaintiffs.  Pl.

However, defendants do not allege that they have formally moved for this sanction before Magistrate-Judge Wall, or that Judge Wall has granted such a motion.

56.1 Statemt at ¶¶ 24, 26; Def. 56.1 Counter-Statemt at ¶¶ 24, 26. That same day, plaintiffs sent Adelmo Cioffi a letter, noting that the station had been "debranded" and demanding that 261 Corp. "restore the premises to operation under the Exxon Brand, pump out all gasoline that was purchased from any source other than Tosco, and promptly restore the station to a complete inventory of Exxon branded gasoline . . . ." Kiriscioglu Aff., Ex. D. This letter also reminded Adelmo that he could not assign his contractual rights and obligations unless he complied with the assignment provisions in the rider to the Supply Agreement, and threatened legal action if 261 Corp. did not, at a minimum, assure plaintiffs of its intentions to resume performance under the contract by October 18, 2002. *Id.* Plaintiffs subsequently sent Adelmo Cioffi a second letter, containing the same or similar language. Pulcini-Gillece Aff. at Ex. 6.[2]

261 Corp. did not comply with plaintiffs' demands. Moreover, although Gulden paid for gasoline plaintiffs delivered to the station on October 6, 2002, Gulden never paid for gasoline that was delivered on October 5, 8 and 11, 2002. The parties agree that plaintiffs sold and delivered gasoline worth $55,275.10 on those three dates, and that Exxon issued invoices to 261 Corp. for each of the three sales. Pl. 56.1 Statemt at ¶¶ 35, 37, 38; Def. 56.1 Counter-Statemt at ¶¶ 35, 37, 38. However, the parties disagree as to the amount owed. Plaintiffs claim defendants owe the entire amount, plus $281.88 in rent, for a total of $55,556.98. *See* Pl. 56.1 Statemt at ¶¶ 41-43. Gulden claims it was entitled to a "rebate credit payment of $830.41" pursuant to the Hours rebate credit agreement, and was never paid the $7,500 owed under the Payment Agreement for September 2002. Kiriscioglu Opp. Aff. at ¶ 16-18. Gulden also implies that it does not owe the $281.88 in rent, and therefore owes only $46,944.69. *Id.*

---

[2]Although the Pulcini-Gillece Affidavit states that this letter was faxed to 261 Corp. on October 17, 2002, *id.* at ¶ 39, the letter itself – attached as Exhibit 6 to that affidavit – is dated October 22, 2002.

On December 17, 2002, plaintiffs commenced this action. Plaintiffs' complaint, as amended by the Amended Complaint, dated April 15, 2003, and filed May 19, 2003, contains nine causes of action or "Counts." The first count alleges breach of the CDA Agreements by 261 Corp., and seeks damages of not less than $200,000, plus interest, from this defendant. The second count alleges tortious interference with the CDA Agreements by all defendants other than 261 Corp., and seeks not less than $400,000, plus interest, and punitive damages from these four defendants.

Count Three alleges that all defendants converted the "Equipment" loaned under the Equipment Agreement. The Amended Complaint defines the term "Equipment" by listing the items loaned in 1996 and cataloged in Exhibit A to the Equipment Agreement. Amended Complaint at ¶ 22. By using this defined term, Count Three refers solely to this "Equipment." Moreover, the count specifically alleges:

> Under the . . . Equipment Agreement, in or about 1996, Exxon contributed to the installation of the Equipment at the Premises for 261 Corp. to use in connection with the supply and sale of Exxon branded gasoline under the CDA Agreements, in the approximate amount of $109,100.00.

Amended Complaint at ¶ 59. This count, which seeks damages of not less than $150,000, plus interest, and punitive damages, makes no reference to the $79,580.73 worth of Additional Equipment which plaintiffs allegedly installed on September 14, 2001, and April 30, 2002.

Counts Four and Seven seek to recover from 261 Corp. the $55,556.98, plus interest, which plaintiffs claim to be owed for gasoline delivered, and for rent due, in October 2002. Count Four relies on a "goods sold and delivered" theory, and Count Seven asserts that 261 Corp. is liable on an "account-stated" theory. Counts Five and Six seek to recover both for the $55,556.98, plus interest, and the $150,000, plus interest, which defendants allegedly owe for the

Equipment. Count Five advances a "quantum meruit" theory, and Count Six relies on "unjust enrichment."

Count Eight alleges that Adelmo and Madeline Cioffi personally guaranteed 261 Corp.'s performance by executing the Key Person Clause to the Supply Agreement. This count seeks to recover for "all amounts due [plaintiffs]," plus interest. Amended Complaint at ¶ 91. The ninth count seeks to recover all costs, fees (including attorney's fees) and expenses plaintiffs incur in prosecuting this action.

In their answer to the Amended Complaint, defendants advance five affirmative defenses, the second of which alleges fraudulent inducement. In support of this defense, defendants allege that "Exxon had represented to Adelmo Cioffi prior to and at the time the various agreements had been signed by Mr. Cioffi . . . that, if prior to December 1, 2006, 12,150,000 gallons of Exxon-branded gasoline had been purchased from Exxon at the Premises, the [S]upply [A]greement and the other agreements could be terminated." Answer to Amended Complaint at ¶ 97. Defendants further allege that Mr. Cioffi, who had not consulted with an attorney before signing the contracts, relied on this representation in signing the CDA Agreements. *Id.* at ¶¶ 98-99.

Plaintiffs now move for summary judgment on all nine counts of the Amended Complaint. Defendants admit liability under Counts Four and Seven, but argue that total damages under these two counts should be limited to $46,944.69. Defendants contest the entry of summary judgment on all remaining counts, and move for summary judgment as to Counts Two, Three, and Eight and for partial summary judgment with respect to Counts One, Five and Six. In addition, defendants argue that if Counts Two and Three are not dismissed, this Court should at least dismiss the claims for punitive damages under these Counts.

## DISCUSSION

<u>The Summary Judgment Standard</u>

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e)*; Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the disputed facts must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

<u>Count One: Breach of Contract</u>

Count One of the Amended Complaint alleges that 261 Corp. breached the Supply Agreement by failing to buy and receive all gasoline sold at the Premises from plaintiffs, in violation of Article 9 and § 2.1, and by transferring or assigning its rights under the CDA Agreements, in violation of § 15.1. In moving for summary judgment on this count, plaintiffs argue that 261 Corp. is required under ¶ 9 of the Payment Agreement to pay liquidated damages of "1.6 cents per gallon for each gallon of gasoline that . . . [261 Corp.] . . . was obligated to purchase during the remaining term of the Supply Agreement, but has not purchased at the time the Supply Agreement is terminated." Plaintiffs' Memorandum of Law ("Pl. Memo") at 6.

Defendants respond by arguing that Exxon fraudulently induced Adelmo Cioffi to enter the CDA Agreements by falsely representing that 261 Corp. could terminate the contracts without liability after 261 Corp. purchased 12,150,000 gallons of gasoline from Exxon. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp. Memo") at 3-4. Defendants further argue that 261 Corp. was entitled to transfer or assign its rights under New York General Business Law § 199-i, *id.* at 6-7, and that the Payment Agreement was amended to provide for liquidated damages of 0.7 cents, rather than 1.6 cents, per gallon. *Id.* at 7-8. Defendants also move for summary judgment on the latter point, asserting that it is "undisputable" that the Payment Agreement was modified on January 22, 1997. Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Memo") at 4.

Plaintiffs have met their burden of establishing that there is no genuine issue of material fact as to whether defendants breached the Supply Agreement. First, the parties agree that, on October 16, 2002, Gulden stopped operating the Premises as an Exxon-branded station, replaced the Exxon signs and logos with "US Gas" brand signs and logos, and began selling non-Exxon branded gasoline, purchased from suppliers other than plaintiffs. Pl. 56.1 Statemt at ¶¶ 24, 26; Def. 56.1 Counter-Statemt at ¶¶ 24, 26. Assuming, *arguendo*, that the CDA Agreements are valid, this would be a clear violation of Section 2.1 and Article 9 of the Supply Agreement. Second, although defendants correctly note that New York law requires that franchise agreements "be transferable or assignable at the option of the dealer *provided the distributor consents to such assignment*," New York General Business Law § 199-i (emphasis added), defendants do not allege that 261 Corp. sent plaintiffs the "written notice of intent" required under that statute.

Although plaintiffs have established that there is no genuine issue of material fact as to whether 261 Corp. breached the Supply Agreement, defendants have presented evidence that there exists a genuine issue of fact regarding whether Adelmo Cioffi was fraudulently induced to enter into the CDA Agreements. Defendants pled fraudulent inducement as a affirmative defense in their Answer to the Amended Complaint, *see* Answer to the Amended Complaint at ¶ 100, and the Opposition Affidavit of Adelmo Cioffi, dated April 19, 2005 ("Cioffi Opp. Aff."), substantiates that defense. Specifically, Cioffi's Opposition Affidavit states that Richard A. DeBree, Exxon's New York Area Manager, told Cioffi prior to and at the time that the CDA Agreements were executed that 261 Corp. could terminate the Supply Agreement without liability prior to December 1, 2006, if 261 Corp. had already purchased 12,150,000 gallons of Exxon-branded gasoline from Exxon for sale at the Premises. *See* Cioffi Opp. Aff. at ¶ 4. Cioffi further states that he relied on these representations at the time he signed the CDA Agreements, and that he would not have contracted with Exxon if he had known these representations were untrue. *Id.* at ¶ 5.

Since the Supply Agreement contains a merger (or integration) clause, Supply Agreement at Art. 29, "parol evidence is not admissible to vary, or permit escape from, the terms of the integrated contract." *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993). However, notwithstanding the merger clause, parol evidence may be admitted to void the agreement altogether on the ground of fraud. *Id.* (citing *Sabo v. Delman*, 3 N.Y.2d 155, 161-62, 164 N.Y.S.2d 714, 717-19 (1957)). Accordingly, even though Cioffi's testimony concerning DeBree's alleged representations would be parol evidence if offered to vary the terms of the contract, such testimony would be admissible in support of defendants' affirmative defense of fraud in the inducement.

Cioffi's statements alone may be sufficient to make out this affirmative defense. In order to prove fraudulent inducement under New York law, one must prove "(1) that [a party to a contract] made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the [party making it], (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Computerized Radiological Services v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (citing *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186, 193 (2d Dept. 1980)). While this Court may have doubts as to whether this is a viable defense, plaintiffs have not presented any evidence to suggest that this affirmative defense cannot be presented to the jury. Accordingly, plaintiffs' motion for summary judgment as to Count One is denied.

Defendants' motion for summary judgment on this Count is also denied. First, defendants have not met their burden of establishing the absence of a genuine issue of material fact. In his affidavit, Cioffi claims that DeBree agreed to revise the liquidated damages clause on January 22, 1997, and did so by crossing out "1.6" and writing, "1/22/97 Revised 0.7," in the margin of page 6 of the Payment Agreement. Cioffi Aff. at ¶ 19. However, despite Cioffi's assertion that DeBree initialed this change, *id.*, the initials "RAD" appear only once on page six of the copy of the Payment Agreement attached to the Cioffi Affidavit. *See* Cioffi Aff. at Ex. 1. These same initials appear in the copy of the Payment Agreement supplied by plaintiffs, which does *not* contain the alleged January 22, 1997, revision. *See* Pulcini-Gillece Aff. at Ex. 1. Since the Payment Agreement expressly provides that it can be amended, changed or modified only in a "writing . . . signed by all of the parties" to that agreement, Payment Agreement at § 13.E, and

defendants have not adduce evidence of a valid amendment or modification, defendants' motion for summary judgment as to Count One is denied.

Count Two: Tortious Interference

Count Two alleges that all defendants other than 261 Corp. tortiously interfered with the CDA Agreements. Plaintiffs now move for summary judgment against defendants Adelmo Cioffi, Kiriscioglu and Gulden on this count. These defendants, along with Madeline Cioffi, also move for summary judgment, arguing that they were privileged to interfere with the contract.

"Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Losken*, 239 F.3d 256, 273 (2d Cir. 2001) (citing *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)); *see TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 88 (2d Cir. 2005). A corporate officer or director, when acting within the scope of his or her authority, "is not a third party vis-a-vis the corporation and as such cannot interfere with [the corporation's] own contract." *Roselink Investors, L.L.C. v. Shenkman*, 386 F.Supp.2d 209, 228 (S.D.N.Y. 2004). Thus, "[a] corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party." *Id.* (quoting *Chardin v. Turkie,* No. 97 Civ. 4643 (JSM), 1998 WL 886986, at *1 (S.D.N.Y. Dec. 18, 1998); *see Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 914, 411 N.Y.S.2d 219, 220 (1978) (A "director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.")

Plaintiffs are not entitled to summary judgment under Count Two because they have not shown that there is no genuine issue of material fact. As discussed above, there is a question as to whether the CDA Agreements are valid contracts. Defendants claim fraud in the inducement, and have presented this Court with evidence to substantiate this affirmative defense. Plaintiffs have not even addressed this claim in their papers. Accordingly, plaintiffs have not established that the contract is valid and, therefore, cannot establish the first element of their tortious interference claim.

On the other hand, defendants are entitled to partial summary judgment. Adelmo Cioffi is unquestionably the president of 261 Corp. To the extent that he induced the breach of the CDA Agreements, he was acting within the scope of his corporate authority. Plaintiffs have not adduced any evidence to suggest that Adelmo's actions were undertaken for any self-serving or malicious motive, or that the actions were contrary to the interests of 261 Corp. in any respect. Since Adelmo is not a "third party," as that term is used in the elements of a tortious interference claim, he cannot be liable under Count Two.

Similarly, Madeline Cioffi cannot be liable for tortious interference. Plaintiffs do not allege, or present any facts tending to show, that Madeline played any role in the decision to breach the CDA Agreements. Moreover, even if she did play a role, she did so in her capacity as a director and/or officer of 261 Corp. and therefore cannot be liable for tortious interference. Indeed, this Court notes that, in moving for summary judgment, plaintiffs do not even seek summary judgment against Madeline Cioffi on this tortious interference theory. Accordingly, defendants' motion for summary judgment in favor of Adelmo and Madeline Cioffi on Count Two is granted.

Summary judgment is not granted, however, with respect to defendants Kiriscioglu and Gulden. Defendants correctly note that a district court in this Circuit has stated that, "[u]nder New York law, one who has a financial interest in the business of another is privileged to interfere with a contract between the other and a third party *if* his purpose is to protect his own interests and if he does not employ improper means." *Record Club of America, Inc. v. United Artists Records, Inc.*, 611 F.Supp. 211, 217 (S.D.N.Y. 1985) (emphasis in original) (citing *Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 301 N.Y.S.2d 610 (1969)). Relying principally on this language, defendants imply that, under New York law, a lessee is privileged to interfere in the lessor's contractual relationships. However, neither *Record Club* nor *Felsen* can be read as supporting such a broad proposition.

In *Felsen*, the former treasurer of Sol Café alleged that Chock Full O'Nuts, after purchasing all of Sol Café's outstanding stock, had caused Sol Café to terminate the treasurer's employment contract. The *Felsen* Court held that "Chock Full O'Nuts, as the sole stockholder of Sol Café, had an existing economic interest in the affairs of Sol Café which it was privileged to attempt to protect when it 'interfered' with plaintiff's contract of employment with Sol Café." *Felsen*, 24 N.Y.2d at 687, 301 N.Y.S.2d at 613-14.

Similarly, in *Record Club*, the plaintiff alleged that the defendant had "tortiously induced two of [the defendant's] subsidiaries to breach . . . agreements with [the plaintiff]." *Record Club*, 611 F.Supp. at 213. In attempting to define New York law, the *Record Club* Court gave the very broad reading of *Felsen* which is quoted above. However, this language is dictum; the *Record Club* Court declined to hold that the defendant was privileged to induce its subsidiaries to breach the contract with the plaintiff since documents in the record suggested a "dispute as to whether [the defendant's] conduct was fraudulent or malicious." *Id.* at 217.

Therefore, *Record Club* and *Felsen* hold, at most, that a corporate parent is privileged to interfere with the contractual relationships of its subsidiaries. Defendants, who rely exclusively on *Record Club* and *Felsen*, do not cite to any case which suggests that this privilege extends to mere lessees. Accordingly, the motion by defendants Kiriscioglu and Gulden for summary judgment on the second count is denied.

Count Three: Conversion of Equipment

Count Three alleges that 261 Corp. has converted the Equipment loaned to it under the Equipment Agreement. Plaintiffs move for summary judgment against all defendants on this count, seeking $45,461.97 for the Equipment loaned to 261 Corp. on or about December 1, 1996, and $68,579.04 for the Additional Equipment allegedly loaned to 261 Corp. on September 14, 2001, and April 30, 2002. Pl. Memo at 10. In addition, plaintiffs request judgment of $250 month (or a total of $12,500) for defendants' use of the Equipment over the 50-month period between October 2002 and December 2006. *Id.*

Defendants also move for summary judgment, asserting (1) that title to the Equipment originally loaned to 261 Corp. passed to defendants by operation of § 9.1.4 of the Supply Agreement; and (2) that even if title to the Equipment has not passed, defendants owe no more than the costs of installing and removing the Equipment, less ten percent for each year the CDA Agreements were in effect. Def. Memo at 16-18. In addition, defendants contend that plaintiffs' Amended Complaint does not seek to recover for the Additional Equipment. *Id.*

Plaintiffs' motion for summary judgment on Count Three is denied. Plaintiffs have not alleged facts, much less adduced evidence, sufficient to show that conversion has yet occurred. "Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory

right of another in the property." *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53-54 (2d Cir. 1993) (per curiam) (quoting *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dept. 1981)). "However, New York law draws a distinction between a conversion claim where a person has wrongfully taken property and one where a person did not take the property but wrongfully retains [it]." *Newbro v. Freed*, 409 F.Supp.2d 386, 402 (S.D.N.Y. 2006). "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz*, 984 F.2d at 54 (quoting *Johnson v. Gumer*, 94 A.D.2d 955, 955, 464 N.Y.S.2d 318, 319 (4th Dept. 1983)). In such cases, demand for return of the property is an element of the claim for conversion. *Newbro*, 409 F.Supp.2d at 402.

In this case, plaintiffs have not adduced evidence showing that they demanded the return of the Equipment or that defendants have already disposed of the Equipment. To the contrary, plaintiffs emphatically deny that they have terminated the CDA Agreements and seek to recover damages for the use of the Equipment through December 2006. This implies that plaintiffs have not yet requested return of the Equipment, and that plaintiffs' cause of action for conversion has yet to accrue.

In reality, plaintiffs appear to be seeking to recover damages for breach of the Equipment Agreement. Indeed, plaintiffs do not seek to recover the actual value of the Equipment which has allegedly been converted. Rather, plaintiffs' demands that they be reimbursed $45,461.97 for the Equipment loaned to 261 Corp. on or about December 1, 1996, and $68,579.04 for the Additional Equipment allegedly loaned to 261 Corp. on September 14, 2001, and April 30, 2002,

are based on plaintiffs' reading (actually, a misreading) of § 12.3 of the Equipment Agreement.[3] Similarly, plaintiffs' demand that defendants pay $12,500 for use of the Equipment is an attempt to recover the entire amount due under § 4.1 of the Equipment Agreement for the remainder of the contract term.

"New York law is clear in barring claims for conversion where damages are merely sought for breach of contract." *See, e.g., Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, 148 F.Supp.2d 321, 328 (S.D.N.Y. 2001). "Put another way, a plaintiff may not recast a contract-based claim as a tort claim 'where plaintiff is essentially seeking enforcement of the [contractual] bargain.'" *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 432 (S.D.N.Y. 1998) (quoting *In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir. 1993)). Since plaintiffs are essentially seeking damages under the terms of the Equipment Agreement, this Court cannot grant summary judgment in favor of plaintiffs on their conversion claims.

This Court also cannot grant defendants' motion for summary judgment. Defendants' first argument for summary judgment – that the Equipment passed to defendants by operation of § 9.1.4 of the Equipment Agreement – is predicated on the assertion that the Supply Agreement

---

[3]Section 12.3.1 requires 261 Corp. to "reimburse Exxon on demand . . . for the cost of installation and removal" of "Identifications" and "Equipment" if, *inter alia*, 261 Corp. "stops doing business" at the Premises or "does not comply with any of [261 Corp's] agreements with Exxon." *Id.* at 12.3.1. The amount of that reimbursement is prescribed by Section 12.3.2, which reads:

> Exxon and [261 Corp.] agree that the proper reimbursement will be the cost of installation and removal, less Ten percent (10%) for each year that this [CDA Equipment Agreement] has been in effect.

Plaintiffs, however, somehow read this language as obliging 261 Corp. to reimburse them for the amortized value of the Equipment, and have calculated the amounts cited above in accordance with this strained reading of these provisions.

was terminated when defendants breached it on October 16, 2002. *See* Def. Memo at 7. In fact, under Article 20 of the Supply Agreement, defendants' breach gave plaintiffs the right, but not the obligation, to terminate that agreement. Plaintiffs insist that they have not exercised the right to terminate the contract, *see* Pl. Memo at 6, and defendants have not provided any evidence to the contrary. Accordingly, this Court cannot find, as a matter of law, that title to the Equipment passed to defendants pursuant to § 9.1.4.

Defendants second argument, which attempts to limit defendants' liability to $13,200, is also denied. Although this Court agrees with defendants that the Equipment Agreement does not require 261 Corp. to purchase the Equipment from plaintiffs in the event the agreement is terminated, *see* footnote 3, *ante*, the Equipment Agreement expressly provides that Exxon retains title to such Equipment unless title passes under § 9.1.4. *See* Equipment Agreement at § 8.1. As discussed above, defendants have not shown that plaintiffs terminated the contract, or that title to the Equipment passed to the defendants. Accordingly, if plaintiffs can establish that they demanded return of the property and that defendants failed to return it, plaintiffs may still be able to recover the value of the Equipment under a conversion theory. Accordingly, defendants' motion for summary judgment as to Count Three is also denied.

This Court concurs, however, with defendants' contention that plaintiffs' Amended Complaint does not seek to recover for the Additional Equipment allegedly loaned to 261 Corp. on September 14, 2001, and April 30, 2002. The Amended Complaint defines the term "Equipment" by listing the items loaned in 1996 and catalogued in Exhibit A to the Supply Agreement. Amended Complaint at ¶ 22. The Amended Complaint makes no mention whatsoever of the Additional Equipment which Exxon allegedly loaned 261 Corp. in 2001 and

2002.  In seeking to recover for the "Equipment," Count Three seeks to recover only the reasonable value and installation costs of the items loaned in 1996.

Counts Four and Seven: The "Goods Sold and Delivered" and "Account-Stated" Claims

In Counts Four and Seven, plaintiffs seek to recover for the gasoline delivered by plaintiffs to the Premises on October 5, 8 and 11, 2002.  Count Four sets forth a cause of action for goods sold and delivered, the essential elements of which are "the purchase, sale and delivery of goods at an established price and nonpayment therefor."  *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629 (NRB), 2004 WL 830079, at \*2 (S.D.N.Y. April 13, 2004) (citing *"21" Brands, Inc. v. R & J Emmet PLC*, No. 88 Civ. 8392 (JSM), 1990 WL 180136, at \*4 (Nov. 13, 1990)).  Count Seven advances an "account-stated" claim, under which plaintiffs "must prove the existence of an agreement between defendants and [plaintiffs] based upon prior transactions between them."  *Carey v. Mui-Hin Lau*, 140 F.Supp.2d 291, 298 (S.D.N.Y. 2001) (citing *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999)).  "Such an agreement is implied if [a] plaintiff shows that (1) defendants received invoices from him, and (2) defendants failed to object within a reasonable time or defendants made partial payment on account."  *Id.*

There is no genuine issue of material fact with respect to either theory.  The parties agree that "261 Corp. maintained an account with ConocoPhillips for supply of petroleum products to the Premises," and that, pursuant to this arrangement, ConocoPhillips delivered, and 261 Corp. accepted, such products as 261 Corp. requested.  Pl. 56.1 Statemt at ¶¶ 31-33; Def. 56.1 Counter-Statemt at ¶¶ 31-33.  The parties further agree that ConocoPhillips sold and delivered gasoline worth $55,275.10 to the Premises on October 5, 8 and 11, 2002.  Pl. 56.1 Statemt at ¶¶ 35, 37,

38; Def. 56.1 Counter-Statemt at ¶¶ 35, 37, 38.  ConocoPhillips issued 261 Corp. an invoice for each of these three deliveries, *id.*, and 261 Corp. does not allege that it objected to any of these invoices.

These facts are sufficient to establish that plaintiffs are entitled to judgment under both a "goods sold and delivered" and an "account-stated" theory.  Defendants have not presented any evidence or arguments as to why plaintiffs are not entitled to judgment under these theories.  Rather, defendants admit that they owe $55,275.10 for the gasoline.  Def. Opp. Memo at 15-16.[4]

Accordingly, plaintiffs' motions for summary judgment on Count Four and Seven are granted.  However, since $281.88 of the $55,556.98 plaintiffs seek to recover is for rent due under the CDA Agreements, rather than for gasoline, plaintiffs are entitled to only $55,275.10 under these theories.

Counts Five and Six: Quantum Meruit and Unjust Enrichment

Counts Five and Six of the Amended Complaint advance two quasi-contractual theories, under which plaintiffs seek to recover both for the petroleum products delivered to the Premises on October 5, 8 and 11, 2002, and for the reasonable value of the Equipment loaned under the Equipment Agreement.  In moving for summary judgment on these counts, plaintiffs imply that such judgment would only be appropriate "in the event that this Court determines that the CDA Agreements are invalid or unenforceable . . . ."  Pl. Memo at 12.  Defendants respond principally

---

[4]Although defendants allege that they are entitled to offset a portion of the amount due by asserting that they are still owed a "rebate credit payment of $830.41" and were never paid the $7,500 owed under the Payment Agreement for September 2002, Kiriscioglu Opp. Aff. at ¶¶ 16-18, these are not "offsets" but simply amounts allegedly owed to defendants under the CDA Agreements.  Defendants, who challenge the validity of these agreement by asserting fraudulent inducement, cannot now seek to enforce just that portion of the contract which benefits them.

by citing to cases holding that it is impermissible to award damages under these theories where there is an express written contract between the parties. Def. Opp. Memo at 12-14. In addition, defendants move for summary judgment with respect to those portions of Counts Five and Six which seek to recover for use of the Equipment, alleging that title to this Equipment has already passed to defendants by operation of § 9.1.4 of the Equipment Agreement. Def. Memo at 17.

Plaintiffs' motion for summary judgment as to these counts is denied. As both parties recognize, under New York law "it is well settled that absent certain circumstances . . ., '[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" *DiMario v. Coppola*, 10 F.Supp.2d 213, 225 (E.D.N.Y. 1998) (quoting *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987)); *see also City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir. 1988) (relief under quasi-contractual theories "is unavailable where an express contract covers the subject matter"). Not only is there a genuine issue of material fact as to whether the CDA Agreements are valid and enforceable, as noted in the discussion of Count One, *ante*, but plaintiffs themselves are asserting that these agreements are valid and enforceable. Accordingly, plaintiffs have not made the showing necessary to obtain summary judgment on Counts Five and Six.

Defendants' motion for partial summary judgment as to these counts is also denied. As discussed above, defendants have not adduced evidence to show that these contracts have been terminated. Accordingly, this Court cannot find, as a matter of law, that title to the Equipment passed to defendants pursuant to § 9.1.4.

Count Eight: Cioffis' Personal Guarantees

Plaintiffs next move for summary judgment on Count Eight of the Amended Complaint, which alleges that Adelmo and Madeline Cioffi are personally liable for the debts owed by 261 Corp. by virtue of having executed the Key Person Clause to the Supply Agreement. Pl. Memo at 14-15. Defendants also move for summary judgment on this count, arguing that, even if valid, the Key Person Clause cannot be read as guaranteeing 261 Corp.'s performance. Def. Memo at 21.

There is no dispute between the parties concerning the provisions of the Key Person Clause, which by its terms is "incorporated into and made a part" of the Supply Agreement. This clause, like the Supply Agreement itself, is executed only by Adelmo Cioffi, who represents that he, Madeline Cioffi, and Margaret Manzo are the sole shareholders of 261 Corp., and agrees to notify Exxon immediately in writing if the stock is "leased, mortgaged, pledged, assigned, sold, or transferred in any way." Key Person Agreement at ¶ 2. Adelmo Cioffi further agrees that he, as the "Key Person" under the Supply Agreement, will "personally operate on a daily basis the motor fuel store business," and that, if he does not do so, Madeline will. *Id.* at ¶ 3(a) and (b). The Key Person Clause also provides that if either section 2 or 3 is violated, Exxon may terminate the Supply Agreement. *Id.* at ¶ 3(c).

However, the Key Person Clause does not state that either Adelmo or Madeline Cioffi will be personally liable for damages in the event that the Supply Agreement is terminated. None of the language in this agreement provides a basis for plaintiffs' assertion that the Key Person Clause "is equivalent to a personal guaranty of debts." *See* Pl. Memo at 15. Rather, this Court fully concurs with defendants' argument that "[t]he language in the 'Key Person Clause' does not remotely provide that [the Cioffis] guarantee 261 Corp.'s performance under the CDA

Agreements with plaintiffs." *See* Def. Memo at 21. Accordingly, plaintiffs' motion for summary judgment as to Count Eight is denied, and defendants' motion for summary judgment on this count is granted.

Count Nine: Attorney's Fees, Costs and Disbursements

In Count Nine, plaintiffs seek to recover their attorney's fees, costs and disbursements, as provided under Article 19 of the Equipment Agreement and Article 26 of the Supply Agreement. However, as explained in the discussion of Count One, defendants have created a genuine issue of material fact by adducing evidence in support of their claim of fraud in the inducement. Accordingly, plaintiffs' motion for summary judgment on this count is denied.

Punitive Damages

Finally, defendants move for summary judgment as to plaintiffs' claims for punitive damages in Counts Two and Three of the Amended Complaint. Def. Memo at 22. Defendants rely principally on *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 83 N.Y.2d 603, 612 N.Y.S.2d 339 (1994), for the proposition that punitive damages cannot be award for "private wrongs." Def. Memo at 22. Plaintiffs respond by arguing that *Rocanova* applies only "when punitive damages are sought in conjunction with a breach of contract action," and is therefore inapplicable "to punitive damages sought in conjunction with a cause of action for tortious conduct." Plaintiffs' Memorandum of Law in Response to Defendants' Motion for Summary Judgment at 18. Plaintiffs cite to several cases specifically holding that punitive damages are available in conjunction with a tortious interference claims, even if there is no harm to the general public. *Id.* at 18-19 (citing *Brown v. AXA Re*, No. 02 Civ. 10138 (LTS), 2004 WL 941959 (S.D.N.Y. May 3, 2004); *TVT Records v. Island Def Jam Music Group*, 262 F.Supp.2d 188 (S.D.N.Y. 2003); and *Blank v. Baronowski*, 959 F.Supp. 172 (S.D.N.Y. 1997)).

As defendants' arguments correctly suggest, the purpose of punitive damages under New York law "is not to remedy private wrongs but to vindicate public rights." *Rocanova*, 83 N.Y.2d at 613, 612 N.Y.S.2d at 342. Therefore, "[p]unitive damages are not recoverable for an ordinary breach of contract." *Id.* However, "[p]unitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious under the *Walker* standard to warrant the additional imposition of exemplary damages." *Id.*, 83 N.Y.2d at 613, 612 N.Y.S.2d at 342-43.

The "*Walker* standard" is set forth in *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488 (1961), in which the Court of Appeals held that exemplary damages are recoverable in cases of fraud and deceit involving "high moral culpability," provided the conduct was "aimed at the public generally." *Id.*, 10 N.Y.2d at 405, 223 N.Y.S.2d at 491. Thus, under *Rocanova*, "a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." *Rocanova*, 83 N.Y.2d at 613, 612 N.Y.S.2d at 343. The current state of New York law has been summarized by a court in this Circuit as follows:

> New York law permits a plaintiff to recover punitive damages in tort actions arising from the parties' contractual relationship if the plaintiff demonstrates (1) that the defendant's conduct is actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.

*Day Spring Enterprises, Inc. v. LMC Int'l, Inc.*, No. 98-CV-0658A(F), 2004 WL 2191568, at *30 (W.D.N.Y. Sept. 24, 2004) (report and recommendation of Foschio, M.J.) (internal quotations and citations omitted).

Although the cases on which plaintiffs rely were decided after *Rocanova*, these cases either rely on pre-*Rocanova* case law or a misreading of *Rocanova*. In holding that punitive damages are allowable in tort cases "even if there is no harm aimed at the general public 'so long as [a] very high threshold of moral culpability is satisfied,'" *Brown* and *Blank* both rely on *Giblin v. Murphy*, 73 N.Y.2d 769, 536 N.Y.S.2d 54 (1988), a case which preceded *Roconova*. *See Brown*, 2004 WL 941959, at *9; *Blank*, 959 F.Supp. at 179. Moreover, *TVT Records*' finding – that *Roconova* permits a "narrow exception" in which a defendant's conduct evincing a particularly high degree of bad faith obviates the need to show harm aimed at the public – has been expressly rejected by the Second Circuit. *See TVT Records*, 412 F.3d at 94.

Accordingly, this Court concludes that New York law does not permit punitive damages under Counts Two and Three, since the torts involved were purely private wrongs and not aimed at the public generally. Moreover, even if punitive damages were available, they could not be awarded here because there is no evidence of the sort of egregious conduct necessary to award punitive damages under *Brown*, *Blank* and *TVT Records*. Accordingly, defendants motion for summary judgment with respect to the punitive damages claims contained in Counts Two and Three is granted.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for summary judgment is granted only with respect to Counts Four and Seven of the Amended Complaint, and only to the extent of awarding plaintiffs $55,275.10.   Defendants' motion for partial summary judgment is granted with respect to Count Eight, and is granted to the extent of dismissing those claims against the Cioffis under Count Two.  In addition, defendants' motion for summary judgment is granted with respect to the punitive damages requested in Counts Two and Three.

The parties' motions for summary judgment are denied in all other respects.  This matter is hereby referred to Magistrate Judge Wall to conduct a settlement conference and to supervise the preparation of an amended joint pre-trial order consistent with this Memorandum and Order.

**SO ORDERED.**

                                              _____/s/_____
                                              SANDRA L. TOWNES
                                              United States District Judge

Dated: Brooklyn, New York
         March 31, 2006